## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## NORTHERN DIVISION

**AMANDA COFFMAN**                                                      **PLAINTIFF**


**VS.**                              **No.  3:20-cv-00338 PSH**


**KILOLO KIJAKAZI,[1] Acting Commissioner,**
   **Social Security Administration**                          **DEFENDANT**

### ORDER

Plaintiff Amanda Coffman ("Coffman"), appeals the final decision of the
Commissioner of the Social Security Administration (defendant "Kijakazi") to deny
her claim for Disability Insurance benefits ("DIB").   Coffman maintains the
Administrative Law Judge ("ALJ") erred by failing to give good reasons for rejecting
the opinions of treating rheumatologist Dr. Leslie McCasland ("McCasland").   The
parties have ably summarized the testimony given at the administrative hearing
conducted on December 10, 2019.  (Tr. 36-67).  The Court has carefully reviewed the
record, including the medical records, to determine whether there is substantial
evidence in the administrative record to support Kijakazi's decision.   42 U.S.C. §

---

[1] Kilolo Kijakazi became Acting Commissioner of Social Security on July 9, 2021, and
is the proper defendant.  Fed. R. Civ. P. 25(d).

405(g).  The relevant period under consideration is from March 1, 2018, the alleged onset date, through January 14, 2020, the date of the ALJ's decision.

*The Administrative Hearing:*

In response to questions posed by the ALJ, Coffman stated she was 48 years old and lived with her husband.  She was 5' 8", weighed 214 pounds, and had the equivalent of a high school education.  Coffman described the part-time job she had since June 2018 and continued to perform at the time of the hearing – she was a delivery driver, working 15-20 hours a week, typically working from 8 a.m. till noon, with the job requiring her to be seated half the time and standing half the time, and with no lifting over 7 pounds.  The job required her to drive for four hours 4-5 times each week.  Coffman also described past relevant work she performed prior to the current part-time job.

Coffman explained she could not work full time because her current job "takes every bit of energy that I have just to stay at that job."  (Tr. 48).  Coffman cited lung and lower back pain, and general body fatigue as barriers to full time work, complicated by her allergies to pain medications.  She also stated she has chronic obstructive pulmonary disease ("COPD"), using a nebulizer 2-3 times each week at her home.  Coffman indicated she ceased smoking in August of 2018.  She also claimed she suffered from problems with her left ankle, right elbow tendinitis, carpal

tunnel syndrome, high blood pressure, and migraines. Coffman stated she was scheduled to receive care for her left ankle and pain management treatment in the weeks following the hearing.

In response to questioning from her attorney, Coffman said her current job was in jeopardy due to her impairments, and she could not work full time. She stated Drs. McDaniel and McCasland had diagnosed her with fibromyalgia, which she had been experiencing for 4-5 years. According to Coffman, these doctors had found many trigger points, and she experienced the fibromyalgia in her neck, hips, elbows, and feet. The fibromyalgia was "everywhere all the time" and prevented her from sleeping soundly. (Tr. 52). She also stated she had restless leg syndrome, daily headaches, sinus problems requiring three surgeries in the past and more surgery in the future, three bouts of shingles, asthma, polyps in her nose, and is depressed and cries at work. Coffman indicated she had bad headaches 2-3 times a month, requiring her to lie down in the dark, causing nausea, and requiring a full day for recovery. She stated the headaches resulted in her missing work on 2-3 occasions. Coffman further described that the combination of carpal tunnel syndrome and fibromyalgia resulted in her inability to fasten her bra. "My whole body hurts." (Tr. 54). Also, she indicated she receives a shot to open her airways, in part due to her allergies to pain medications and aspirin. She testified her allergic reactions have resulted in 3-4 emergency room

visits, and that she now has an Epipen with her at all times.  Finally, she stated that her Lyrica prescription medication causes drowsiness.

Upon further questioning by the ALJ, Coffman stated she had twice been to Mid-South for mental health care, the latest visit occurring 2-3 months prior to the hearing.

Coffman described her activities after her job duties ended at noon as going home to bed and dealing with neck pain radiating to her right hand.  On days when she was not working, Coffman stated she quilted and napped.  Coffman credited her husband for preparing meals, shopping, doing dishes, laundry, and cleaning.  Her husband and her mother drive her to some medical appointments, according to Coffman, and she no longer provided care for her three year old grandson.  (Tr. 42-61).

Kola Brown ("Brown"), a vocational expert, testified.  The ALJ posed a series of hypothetical questions to Brown.  One of the questions asked Brown to consider a hypothetical worker of Coffman's age, education, and experience, who could perform sedentary work with the following restrictions:  she could never climb ladders, ropes, or scaffolds; could frequently reach with the right upper extremity and frequently handle objects with the right hand; must avoid concentrated exposure to extreme heat, cold, and excessive humidity; must avoid concentrated exposure to

irritants such as fumes, odors, dust, gases, and poorly ventilated areas; and must avoid concentrated exposure to excessive vibration. Brown responded that such a worker could not perform Coffman's past relevant work. Brown testified, however, that such a worker could perform the jobs of document preparer and circuit board assembler. (Tr. 61-66).

*ALJ's Decision:*

In his January 14, 2020, decision, the ALJ determined Coffman had the following severe impairments: fibromyalgia, mild osteoporosis, old T-11 compression fracture, degenerative disc disease of the lumbar spine with radiculopathy, asthma/COPD, right elbow tendinitis and arthralgia, reflex sympathetic dystrophy ("RSD"), degenerative joint disease of the left ankle with tendon tears and tendinitis, and obesity. The ALJ identified the following impairments which he deemed non-severe: chronic sinusitis, osteopenia, restless leg syndrome, allergies to aspirin and non-steroidal anti-inflammatory drugs ("NSAIDs"), leukocytosis, cholecystectomy, degenerative disc disease of the cervical spine, and depressive disorder and anxiety disorder. The ALJ considered the "paragraph B" criteria regarding mental impairments, finding Coffman had a mild limitation in understanding, remembering, or applying information, a mild limitation in interacting with others, a mild limitation in concentrating, persisting, or maintaining pace, and a mild limitation in adapting or

managing oneself.

The ALJ found Coffman did not have an impairment or combination of impairments that met a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ expressly considered if Coffman met Listing 1.02 or 1.04.

The ALJ further determined Coffman had the residual functional capacity ("RFC") to perform sedentary work with the restrictions which mirrored those detailed in the hypothetical question posed to Brown. The ALJ, citing the appropriate factors, assessed Coffman's subjective allegations, finding her statements "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 23). The ALJ thoroughly discussed the medical evidence, beginning with treatment notes from July 2016, about eighteen months before the onset of the relevant period. As part of his review, he recited the treatment Coffman received at McCasland's Clinic, beginning on January 15, 2019. The ALJ also addressed McCasland's March 15, 2019, fibromyalgia medical assessment form in detail, and McCasland's May 7, 2019, letter indicating Coffman could work only 20 hours per week. Finally, the ALJ reviewed McCasland's October 21, 2019, physical medical source statement. The ALJ concluded McCasland's opinions were not persuasive, explaining:

> The treating relationship with the claimant at the time the opinions were
> provided was only short term, and the opinions were not supported by or
> consistent with other medical records. The opinions . . . also appear to
> be based on the claimant's subjective complaints and appear to be

6

sympathetic opinions. These opinions are not supported by the physician's own objective clinical or examination findings. Dr. McCasland did not review other medical evidence. Her opinions are totally inconsistent with the objective testing which in no way supports her drastic limitations. Her opinions are also at odds with the vast number of normal physical examinations found throughout the record. Finally these opinions are inconsistent with the ability to do any work, yet the claimant is working 15-20 hours per week near the SGA level. Given the extreme limitations in opinions 14F and 18F [McCasland's opinions rendered on March 15 and October 21, 2019], this would be impossible.

(Tr. 29).

The ALJ also considered the opinions of the state agency mental health experts, who opined Coffman's mental impairments were non-severe. The ALJ found these opinions consistent with and supported by the medical records, and therefore persuasive. However, the ALJ found the opinions of the state agency medical experts that Coffman could perform light work were not persuasive. The ALJ determined Coffman could not perform her past relevant work. However, relying upon Brown's testimony, the ALJ held that Coffman could perform other sedentary work in the national economy. Accordingly, the ALJ concluded she was not disabled. (Tr. 16-31).

### Coffman's Claim – ALJ Error in Assessing McCasland's Opinions

Coffman contends the ALJ failed to comply with the relevant regulations for evaluating medical opinion evidence when considering the opinions of treating

rheumatologist McCasland.  McCasland offered her opinions on three occasions: (1) a March 15, 2019, Fibromyalgia Medical Assessment Form; (2) a May 7, 2019, "To Whom It May Concern" letter; and (3) an October 21, 2019, Physical Medical Source Statement.

March 2019 Opinions

The Fibromyalgia Medical Assessment Form indicated McCasland began treating Coffman on January 15, 2019, seeing her bi-monthly.  McCasland opined that Coffman met the 2010 diagnostic criteria for fibromyalgia as defined by the American College of Rheumatology and had the following symptoms: widespread pain; signs of chronic fatigue syndrome; self-reported short-term memory impairment; self-reported concentration impairment; multi-joint pain without redness or swelling; recurrent and severe headaches; shortness of breath or breathlessness; post-exertional malaise exceeding 24 hours; diffuse muscle pain; leg cramps; restless leg; muscle pain; un-refreshing sleep; chronic pain, IBS; carpal tunnel syndrome; paresthesia; depression/anxiety; and sicca syndrome.  McCasland reported Coffman did not allege a specific onset date, and McCasland did not provide an onset date, although she noted the symptoms lasted at least three months and were related to emotional factors.

McCasland rated Coffman's pain as moderate, and listed nine positive trigger point areas out of eighteen possible trigger points.  McCasland opined Coffman had

constant pain in her neck, hips, lower legs, and intermittent pain in her left elbow. She listed the following positive objective signs of Coffman's impairments: spasms, chronic fatigue, tenderness, impaired sleep, and limitation in motion. McCasland did not believe Coffman to be a malingerer, and opined that her condition would last at least twelve consecutive months, that her symptoms would cause her to miss about three days a month from work, and that her medications would cause side effects of dizziness and drowsiness.

McCasland estimated that Coffman could walk less than one block without rest or severe pain, sit for thirty minutes before needing to get up, stand for ten minutes before needing to sit down or walk around, and could stand/walk less than two hours in a workday. McCasland also opined Coffman would need to sit quietly during unscheduled ten-minute breaks every thirty minutes during the workday. McCasland rated Coffman's ability to lift, finding she could never lift fifty pounds, rarely lift twenty pounds, occasionally lift ten pounds, and frequently lift less than ten pounds. In addition, McCasland opined Coffman could never climb ladders and rarely stoop, bend, crouch, crawl, kneel, and climb stairs. According to McCasland, Coffman could occasionally look down, turn her head left or right, look up, or hold her head in a static position.

Turning to mental health, McCasland determined Coffman experienced the

following impairments: difficulty with short-term memory, difficulty following simple directions, impaired social interaction, inability to adjust to routine work changes, confusion, "fuzzy" thinking, distractibility, difficulty with word use and recall, difficulty with routine problem solving, and disorientation to time and place. McCasland indicated these mental impairments would result in a 10% interference with Coffman's ability to complete a workday. Coffman could not tolerate even "low stress" work and would experience good and bad days, according to McCasland. (Tr. 1038-1042).

May 2019 Opinion

In her May 7, 2019, letter, McCasland opined Coffman "is only able to work twenty hours a week at this time due to her medical conditions." (Tr. 1073). The letter lists no restrictions on the type of work Coffman might perform.

October 2019 Opinions

McCasland's October 21, 2019, Physical Medical Source Statement, a one page checklist, indicated Coffman could occasionally lift ten pounds, frequently lift less than ten pounds, stand and walk less than two hours in a workday, and sit about two hours. McCasland estimated Coffman would need to change positions frequently, need frequent rest periods and longer than normal breaks. McCasland opined Coffman was unable to reach, she could finger and handle for one third of a workday,

and side effects from her medications would affect her ability to work.  McCasland also indicated Coffman should avoid all exposure to extreme cold and heat, high humidity, fumes, odors, dust, gas, perfumes, soldering fluxes, solvents/cleaners, and chemicals.  According to McCasland, Coffman's impairments would cause her to miss more than three days a month from work.  McCasland listed "multiple tender points" and "wheezing" as the objective medical findings supporting Coffman's limitations. (Tr. 1071).

**Analysis**

The regulations governing the consideration of the medical opinions were revised for claims filed on or after March 27, 2017.  Coffman filed her claim on June 12, 2018.   The new regulations eliminated the "long-standing 'treating physician' rule." *See Fatuma A. v. Saul*, 2021 WL 616522, 5 (D. Minn. 2021), report and recommendation adopted, 2021 WL 615414 (D. Minn. 2021).  The regulations now provide the following:

> ... Under the new regulatory scheme, the Commissioner "will not defer or give any specific weight, including controlling weight, to any medical opinion(s)," including those from treating physicians. 20 C.F.R. 404.1520c(a). Instead, ALJs will determine the persuasiveness of each medical source or prior administrative medical findings based on supportability; consistency; relationship with the claimant; specialization; and any other factor that tends to support or contradict a medical opinion. 20 C.F.R. 404.1520c(a), (c). ALJs are required to "explain" their decisions as to the two most important factors—supportability and consistency. 20 C.F.R. 404.1520c(b)(2). The

11

"more relevant the objective medical evidence and supporting explanations presented" and the "more consistent" a medical opinion is with evidence from other medical and non-medical sources, the more persuasive the opinion should be. 20 C.F.R. 404.1520c(c)(1)-(2).

The new articulation requirements are meant to "provide individuals with a better understanding of [the Commissioner's] determinations and decisions" and "provide sufficient rationale for a reviewing adjudicator or court." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, at 5854, 5858 (January 18, 2017). ...

*See Phillips v. Saul*, 2020 WL 3451519, 2 (E.D. Ark. 2020) (Deere, MJ).

The new regulations require the ALJ to discuss, at a minimum, the supportability and consistency of a medical opinion. He did so. The paragraph from the ALJ's decision, quoted above, addresses both the supportability and consistency of McCasland's opinions, and clearly explains why the ALJ deemed the opinions unpersuasive.

Four examples support the ALJ's decision. First, the ALJ found the opinions unpersuasive, in part, because McCasland's treating relationship with Coffman at the time the opinions were provided was only short term. The ALJ was correct in this regard. Coffman first visited McCasland on January 15, 2019. McCasland's detailed opinion of March 15, 2019, was based exclusively on the initial visit. McCasland's letter of May 7, opining that she could work only twenty hours a week, also preceded Coffman's second visit to McCasland, on May 13. A long course of treatment enhances the reliability and persuasiveness of opinions; opinions based on one visit

12

are not comparable.  Coffman points to the opinions contained in the October 21 form executed by McCasland.  While this checklist form was executed after three additional visits to McCasland this does not cure the problem with the earlier opinions.  The ALJ did not err in citing the short term treating relationship as a factor in considering McCasland's opinions.

Second, Coffman faults the ALJ for finding that the "extreme limitations" found by McCasland suggested Coffman would be unable to do any work, yet she was working 15-20 hours per week at the time of the hearing. (Tr. 29).  Coffman contends McCasland's limitations were consistent with her part time work, pointing out that McCasland determined Coffman could stand/walk for less than two hours and sit for about four hours in a workday, and could occasionally lift ten pounds and frequently lift less than ten pounds.  This argument fails because McCasland's limitations did not stop with the stand/walk/sit/lift limitations cited by Coffman, but also included her need for frequent breaks, normal than longer breaks, her inability to reach, and her inability to tolerate even low stress work.  The ALJ correctly assessed McCasland's opinions as imposing limitations inconsistent with the work which Coffman was performing at the time of the hearing.

A third example supports the ALJ's treatment of McCasland's opinions. Coffman contends the ALJ erred in stating McCasland's opinions were at odds with

the other medical evidence.  Specifically, Coffman cites other doctors and nurses who diagnosed and treated her for fibromyalgia.  While Coffman is correct that other medical providers diagnosed her with fibromyalgia, it does not follow that these other providers are in harmony with McCasland's opinions of her limitations.  There is no debate on the issue of Coffman's fibromyalgia.  Indeed, the ALJ found it to be a severe impairment.  *See, e.g., Grindley v. Kijakazi*, ___ F.4th ___, 2021 WL 3556102, (8th Cir.) (August 12, 2021) (ALJ acknowledged, and no one disputes, that fibromyalgia can be a severe and chronic condition).  However, McCasland's *limitations*, not her diagnosis, are at odds with the other medical providers, and the ALJ correctly noted such.[2]

Finally, the ALJ noted McCasland's own findings were not consistent with the opinions she rendered.  There was no error by the ALJ in this regard.  The physical examination at Coffman's initial visit reflected eighteen tender points (out of eighteen)

---

[2]

Seen by Dr. Nathan Turney ("Turney") in March 2018, Coffman was diagnosed with fibromyalgia and other impairments.  Turney's physical examination reflected normal musculoskeletal and neck range of motion.  (Tr. 1234).  At a follow up visit in January 2019 the physical examination results were unchanged.  (Tr. 1254).  Coffman was treated by Dr. Christopher Rowlett ("Rowlett") in February 2019 for left ankle pain. Rowlett's physical exam results showed she was in no distress, with normal range of motion.  (Tr. 1261-1262).  Coffman was seen by Dr. Justin Michael Baggs ("Baggs") in October 2019, complaining of chest and back pain.  Baggs found Coffman in no distress with normal range of musculoskeletal motion and tenderness in her thoracic back.  (Tr. 1287).

and decreased range of motion in her spine. Otherwise, the physical exam was largely normal. Coffman's straight leg raise was negative, her muscle strength was 5/5 in all major muscle groups, no joint swelling was noted, and her mental status was normal. (Tr. 1016). McCasland ordered x-rays of Coffman's hands and lumbar and cervical spine. These images were negative. McCasland's October 2019 medical source statement listed only multiple tender points and wheezing as the objective medical basis for the many restrictions she found. The ALJ did not err in observing that McCasland's own findings were at odds, at least in part, with her opinions.

Coffman's arguments targeting the ALJ's treatment of McCasland's opinions are without merit. The ALJ complied with the pertinent regulations, analyzing the supportability and consistency of McCasland's opinions.

In summary, the ultimate decision of Kijakazi was supported by substantial evidence. The Court is mindful that its task is not to review the record and arrive at an independent decision, nor is it to reverse if some evidence supports a different conclusion. The test is whether substantial evidence supports the ALJ's decision. *See, e.g., Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). This test is satisfied in this case.

IT IS THEREFORE ORDERED that the final decision of Kijakazi is affirmed and Coffman's complaint is dismissed with prejudice.

IT IS SO ORDERED this 26th day of August, 2021.

_____

UNITED STATES MAGISTRATE JUDGE